**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CARNEYS POINT TOWNSHIP,

        Plaintiff,

    v.

E. I. DU PONT DE NEMOURS AND
COMPANY and SHERYL A.
TELFORD,

        Defendants.

1:17-cv-00264-NLH-JS

**OPINION**

**APPEARANCES:**

ALBERT I. TELSEY
CATHERINE PASTRIKOS KELLY
MATTHEW PATRICK DOLAN
MEYNER AND LANDIS LLP
ONE GATEWAY CENTER
ST 2500
NEWARK, NJ 07102
    On behalf of Plaintiff

GLENN ANTHONY HARRIS
DAVID A. HAWORTH
BALLARD SPAHR LLP
210 LAKE DRIVE EAST
SUITE 200
CHERRY HILL, NJ 08002
    On behalf of Defendants

**HILLMAN**, District Judge

    This matter, which concerns the New Jersey Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1k-6, et seq., was removed from New Jersey state court to this Court pursuant to 28 U.S.C. § 1332(a). Defendants contend that this Court may exercise subject matter jurisdiction over the matter because diversity of

citizenship exists between Plaintiff Carneys Point Township – a citizen of New Jersey - and Defendant E. I. Du Pont De Nemours and Company ("DuPont") – a citizen of Delaware.  Defendants further contend that the Court must ignore the New Jersey citizenship of Defendant Sheryl A. Telford because Plaintiff fraudulently joined her to the action for the sole reason to prevent removal.

Shortly after the removal of Plaintiff's complaint, Telford filed a motion to dismiss all of Plaintiff's claims against her, DuPont filed a motion to dismiss one count against it, and Plaintiff filed a motion to remand, arguing that Telford was properly joined as a defendant, and Defendants' only reason for removing the matter was to derail the date for the order to show cause hearing that had been set before the state court judge. For the reasons expressed below, the Court will grant Plaintiff's motion to remand, and deny as moot Defendants' motions to dismiss.

<u>**BACKGROUND**</u>

New Jersey enacted ISRA, formerly the Environmental Cleanup Responsibility Act, in 1983 because New Jersey is home to many industrial sites and has been saddled with the cost of remediating many contaminated properties now abandoned.[1]

---

[1] <u>See</u> N.J.S.A. 13:1K-7 - Legislative findings and declarations: "The Legislature finds that discharges of toxic chemicals dating

Plaintiff's complaint explains that ISRA requires owners and operators of industrial property or businesses in New Jersey to cleanup all hazardous substances and wastes they discharged to the environment prior to: (1) transferring the real property of the industrial establishment; (2) transferring the stock and non-real property assets of the industrial business; or (3) executing a merger agreement, among other triggers.  If an owner or operator cannot remediate the property prior to the transfer, ISRA allows the owner or operator to provide the New Jersey Department of Environmental Protection with the cost to remediate the site and surrounding areas calculated by a computer software program called RACER®.  The money must be reserved and set aside as a "remediation funding source" ("RFS"), which the company can use to remediate the site.  The RFS also acts like a "cookie jar" of money specifically set

------

back to early industrialization have left a legacy of contaminated industrial property in this State; that in 1983, due to the growing public awareness and concern of the risks to the public health and the environment and the potential costs to the State to clean up abandoned contaminated sites, the 'Environmental Cleanup and Responsibility Act' was enacted. The Legislature also finds that the act's imposition of a cleanup plan approval before the transfer or upon the closing of an industrial establishment and the requirement to establish a funding source for the cleanup are in the general public interest by ensuring the discovery of contamination, by assuring that funding for cleanup is set aside at the time it is available from a transfer or closing, and by assuring that contaminated property is not abandoned to the State for cleanup."

aside in the event the company fails to undertake or complete the work.  In that instance, the NJDEP can use the money to complete the cleanup, or affected municipalities can petition the NJDEP to use the money to complete the cleanup.

ISRA also requires owners or operators who do not comply with ISRA to pay base penalties of $10,000 to $20,000 per day per violation until compliance is achieved.  Violators must also disgorge the economic gain reaped as a result of not complying with ISRA.  In addition, ISRA holds corporate officers or managers who direct or authorize ISRA noncompliance to be personally liable for penalties.

Plaintiff's complaint relates that DuPont has been making gunpowder, dyes and chemicals at Chambers Works, a 1,445-acre site located at the foot of the Delaware Memorial Bridge, for over 100 years, and over 100 million pounds of hazardous waste has been discharged to soil and groundwater at the site over that time period.  Plaintiff claims that the Townships of Carneys Point, Pennsville, Mannington and Penns Grove with a combined population of more than 28,000 residents have been impacted by the discharge of these hazardous substances because they have migrated as far as two miles from Chambers Works. Plaintiff performed a RACER analysis and has calculated that the cost of cleaning up the site and the surrounding area will be at least $1.126 billion.

Plaintiff alleges that in 2014 and 2015, DuPont began a series of corporate transfers to shed itself of its "dirty" businesses to become a more attractive merger partner with Dow Chemical Company ("Dow"). To accomplish that goal, DuPont transferred its Titanium Technologies, Fluoroproducts and Chemical Solutions businesses (collectively, the "Performance Chemicals Businesses") and the properties associated with them, including Chambers Works among others, to The Chemours Company ("Chemours") and its subsidiaries including Chemours FC, in exchange for $3.9 billion and Chemours' assumption of much of DuPont's environmental liabilities.

Plaintiff claims that these transfers triggered ISRA at Chambers Works three times, but DuPont intentionally did not comply with ISRA by failing to remediate Chambers Works or post $1 billion as an RFS. Plaintiff also claims that Telford, as Director of DuPont's Corporate Remediation Group, played an integral role in assisting DuPont violate ISRA by knowingly misinforming the NJDEP about DuPont's corporate transfers of real estate, assets, stocks and liabilities.

In addition to the economic benefit DuPont has gained by failing to post the $1 billion RFS, Plaintiff claims that the daily penalties for DuPont's ISRA violations exceed $130 million, and the daily penalties for Telford's ISRA violations exceed $120 million. Plaintiff alleges that if DuPont's merger

with Dow is executed, DuPont will no longer exist, and Chemours - a company with almost 90% fewer assets than DuPont - may be forced into bankruptcy and the Chambers Works site may be abandoned.  As a result, Plaintiff claims that Chambers Works would be one of the most polluted abandoned chemical manufacturing sites in history, and an industrial nightmare that the residents of New Jersey will be left to clean up without the funds to do so, which is the exact scenario ISRA was designed to prevent.

Plaintiff filed a 31-page, four count verified complaint with hundreds of pages in exhibits in New Jersey Superior Court, Salem County against DuPont and Telford for their alleged ISRA violations, seeking, among other relief, an order to show cause as to why the Superior Court should not find that DuPont triggered ISRA on four occasions, that it must fund a $1.126 billion RFS, and that DuPont and Telford knowingly violated ISRA and are liable for over $450 million in penalties.

Two weeks before the scheduled order to show cause hearing in the Superior Court, DuPont removed the matter to this Court. As explained above, DuPont contends that the basis for this Court's subject matter jurisdiction over the case is 28 U.S.C. § 1332(a) because there is diversity of citizenship between Plaintiff and DuPont and the amount in controversy exceeds $75,000.  DuPont also contends that Telford's citizenship, which

is not diverse from Plaintiff's, should be disregarded because
she was fraudulently joined.  Plaintiff rejects DuPont's
characterization of its claims against Telford, and argues that
the case must be remanded because the Court lacks subject matter
jurisdiction to hear the action.

**DISCUSSION**

**A.    Standard for Fraudulent Joinder**

If a civil action is removed on the basis of U.S.C. §
1441(a), "all defendants who have been properly joined and
served must join in or consent to the removal of the action."
28 U.S.C. § 1446(b)(2)(a).  Where there is more than one
defendant joined, the "rule of unanimity" requires that all
defendants consent to removal.  Di Loreto v. Costigan, 351 F.
App'x 747, 752 (3d Cir. 2009).  There exists an exception to
this rule: the doctrine of fraudulent joinder.  In re Briscoe,
448 F.3d 201, 215–16 (3d Cir. 2006).

The fraudulent joinder doctrine allows a diverse defendant
to remove a civil action, notwithstanding the presence of a non-
diverse co-defendant, if it can establish that the non-diverse
defendant was "fraudulently named or joined solely to defeat
diversity jurisdiction."  Id. at 216.  If the non-diverse party
has been fraudulently joined, it will be dismissed and the
action will remain in federal court.  Id. at 215–16.  If the
non-diverse party has not been fraudulently joined, it will

7

remain in the suit, and the case will be remanded for lack of diversity. Id. Joinder is fraudulent if "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." Id. at 216 (citing Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 32 (3d Cir. 1985)).

The removing defendant bears a "heavy burden of persuasion" in proving that a co-defendant has been joined fraudulently, because "removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand." Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3d Cir. 1992). The Third Circuit has stated that joinder is proper "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants." Id. Unless the claims against the non-diverse defendant are "wholly insubstantial and frivolous," joinder is not fraudulent. Id.

In applying the fraudulent joinder standard, a court is to "assume as true all factual allegations of the complaint" and "resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." Id. at 852. In considering claims against the non-diverse defendant, the court cannot convert its jurisdictional inquiry into a

motion to dismiss.  Id.  It is possible that a party may not have been fraudulently joined, but may still be ultimately dismissed for failure to state a claim upon which relief may be granted.  Id.  The court must only decide whether a cause of action exists, because "to inquire any further into the legal merits would be inappropriate in a preliminary jurisdictional determination."  Briscoe, 448 F.3d at 219.

**B.  Analysis**

**1.  Whether Telford was fraudulently joined**

Under the New Jersey Environmental Rights Act, "Any person may commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment."  N.J.S.A. 2A:35A-4(a).  The NJERA defines "person" as: "corporations, companies, associations, societies, firms, partnerships and joint stock companies, individuals, the State, any political subdivision of the State and any agency or instrumentality of the State or of any political subdivision of the State."  N.J.S.A. 2A:35A-3(a).  Accordingly, Plaintiff filed its civil action against DuPont and Telford for violating ISRA.

"A person" who violates ISRA is subject to civil penalties. ISRA provides:

a. Whenever the Commissioner of Environmental Protection

finds that a person has violated any provision of this act, or any rule or regulation adopted pursuant thereto, or knowingly makes a false statement, representation, or certification in any application, record, or other document filed or required to be maintained pursuant to P.L.1983, c. 330 (C.13:1K-6 et al.), the commissioner may:

(1) issue an order requiring the person found to be in violation to comply in accordance with subsection b. of this section;

(2) bring a civil action in accordance with subsection c. of this section;

(3) levy a civil administrative penalty in accordance with subsection d. of this section; or

(4) bring an action for a civil penalty in accordance with subsection e. of this section.

Pursuit of any of the remedies specified under this section shall not preclude the seeking of any other remedy specified.

Any officer or management official of an industrial establishment who knowingly directs or authorizes the violation of any provisions of P.L.1983, c. 330 (C.13:1K-6 et al.) shall be personally liable for the penalties established in this section.

N.J.S.A. 13:1K-13.1(a).

Plaintiff's complaint contends that Telford violated ISRA's

civil penalties provision, alleging the following:

52. Sheryl A. Telford was the Director of DuPont's Remediation Group and a former official involved with DEP site remediation policy.  After meeting with DEP she wrote DEP a letter on January 30, 2015 to try and convince DEP that even though DuPont was going to transfer a 100% controlling interest of Chemours stock to DuPont shareholders the stock transfer should be exempt from ISRA as a "corporate reorganization not substantially affecting ownership" of Chambers Works.  This exemption provides that, even if a stock transfer is greater than a 50% controlling interest it can, in limited circumstances,

10

still be considered exempt from ISRA, but only if (1) the transferor and transferee are commonly owned entities and (2) the net worth of the transferee is about the same as the net worth of the transferor; that is, not more than 10% less than the net worth of the transferor.  This ISRA exemption applies to the transfer of assets or stock but does not apply to the transfer of real estate.

53. Ms. Telford's January 30, 2015 letter was deceptive. She did not tell DEP that DuPont had just transferred the real estate to Chemours FC a week earlier on January 23, 2015 because the exemption did not apply to a real estate transfer and she did not want to alert DEP that the First ISRA Trigger had just happened.

54. With regard to the Second ISRA Trigger (stock transfer), Ms. Telford did not tell DEP (1) that DuPont's shareholders were independent of DuPont and therefore not under common ownership and (2) she did not tell DEP that the net worth of Chemours was 87% less than the net worth of DuPont - significantly greater than the 10% threshold allowed by the exemption.  In other words, the ISRA exemption for a corporate reorganization not substantially affecting ownership did not apply to the Second ISRA Trigger.  To the contrary, DuPont's transfer of 100% of the Performance Chemical Businesses to Chemours was by definition a corporate reorganization that did substantially affect ownership.

55. Ms. Telford also did not tell DEP that the net worth of Chemours might be even less than 87% that of DuPont's net worth because she did not tell DEP that the cleanup of Chambers Works is over $1 Billion. She also did not tell DEP that Chemours had entered into a Separation Agreement with DuPont agreeing to indemnify DuPont from much of its worldwide environmental responsibility, including ISRA and thousands of PFOA lawsuits pending in Ohio and West Virginia that may result in huge judgments against Chemours - expenses that would further dilute the net worth of Chemours.

56. As a DuPont manager responsible for ensuring environmental compliance and a former DEP official, Telford knew DuPont's actions triggered ISRA and her actions to misdirect DEP violated ISRA.

57. DEP did not respond to Ms. Telford's letter with regard

to ISRA applicability at Chambers Works. DuPont
nevertheless proceeded with its transfers without
submitting a GIN to DEP or Carneys Point and without
remediating the Site or posting the RFS in violation of
ISRA.

58. DuPont's scheme to separate itself from its Performance
Chemicals Businesses including Chambers Works was designed
to saddle the cost of cleaning up the Site on the state of
New Jersey and residents of Carneys Point in order for
DuPont to save expenses and reap profits.

59. DuPont avoided ISRA compliance at Chambers Works by not
cleaning up the Site or posting the RFS in excess of $1B,
which failure has jeopardized the health, safety, welfare
and economic vitality of Carneys Point and its surrounding
areas.

60. ISRA was designed specifically to deny DuPont the
opportunity to off load its contaminated New Jersey sites
to an undercapitalized company without first remediating
the site or posting an RFS but that is just what DuPont
did. DuPont's conduct violates ISRA and is unacceptable.
Carneys Point brings this ERA action to compel DuPont to
comply with ISRA and pay penalties for noncompliance,
including the disgorgement of economic gain.

(Compl. ¶¶ 52-60, Docket no. 1-1 at 16-18.)

Defendants argue that because Telford cannot be held liable

under ISRA, and because Plaintiff's complaint fails to even

allege her liability under ISRA, Telford is an improper party

and must not be considered for diversity purposes. More

specifically, Defendants contend that Plaintiff can succeed on

its cause of action for personal liability against Telford only

if the complaint alleges, and Plaintiff ultimately proves, that:

(1) she was an officer or a "management official" of DuPont with

the authority to "direct or authorize" DuPont to violate ISRA;

and (2) she actually directed or authorized DuPont to violate ISRA in conjunction with the Restructuring; and (3) she directed or authorized the violation of ISRA with full knowledge that an ISRA violation would result from her conduct.

Defendants argue that Plaintiff's complaint does not allege that she was a "management official," which means that she was an individual having the authority to make the decision for DuPont about whether or not to comply with ISRA, and that she actually made the decision that DuPont should not comply with ISRA. In short summary of Defendants' detailed arguments in their 46-page brief as to why Telford is not a proper party to the case, Defendants contend: (1) even though Telford signed the letter referenced in Plaintiff's complaint, lawyers or scientists actually drafted it; (2) the timing of the letter refutes Plaintiff's claims of trigger dates; and (3) Telford states in a declaration that she has never been an officer or management official at DuPont and never had the authority to direct any violation of ISRA.

When determining whether a defendant has been fraudulently joined, the Court must focus on whether the plaintiff's claims against that defendant are wholly insubstantial and frivolous, without any reasonable basis in fact. In doing so, the Court must accept as true all the allegations in the complaint, and resolve any uncertainties in the plaintiff's favor. Defendants'

opposition to Plaintiff's motion to remand has asked the Court to veer from the threshold jurisdictional issue and improperly delve into the merits of Plaintiff's claims against Telford.

It cannot be held frivolous to claim that Telford, the director of DuPont's remediation group who was "a DuPont manager responsible for ensuring environmental compliance and a former DEP official" and "knew DuPont's actions triggered ISRA," and who signed a letter sent to the NJDEP asking that DuPont's stock transfer be considered exempt from ISRA while knowing that she misinformed the NJDEP about the stock transfer, is an "officer or management official of an industrial establishment who knowingly directs or authorizes the violation of any provisions" of ISRA.  N.J.S.A. 13:1K-13.1(a).

Moreover, because ISRA provides that a civil action and civil penalties can be brought against "a person" who has violated ISRA, or "a person" who "knowingly makes a false statement, representation, or certification in any application, record, or other document filed or required to be maintained" pursuant to ISRA, see id., Plaintiff's claims against Telford in its complaint that allege such violations cannot be held to be without any reasonable basis.

Even though Telford may have persuasive and prevailing arguments as to why Plaintiff cannot maintain its claims against her when analyzed under the motion to dismiss standard, the

assessment of fraudulent joinder for jurisdictional purposes is much less exacting. See Batoff, 977 F.2d at 852 ("The inquiry into the validity of a complaint triggered by a motion to dismiss under Rule 12(b)(6) is more searching than that permissible when a party makes a claim of fraudulent joinder. . . . [I]t is possible that a party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted."). It is clear that Plaintiff's allegations against Telford meet the possibility-of-a-claim test for determining whether she was properly joined as a defendant. See Boyer, 913 F.2d at 111 ("If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court."). Consequently, Defendants' removal of the action based on the fraudulent joinder doctrine is unavailing, and the matter must be remanded to New Jersey Superior Court.

### 2. Whether Plaintiff is entitled to attorney's fees and costs

Plaintiff's motion to remand has requested attorney's fees and costs pursuant to 28 U.S.C. § 1447(c), which provides in relevant part, "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the

15

case shall be remanded.  An order remanding the case may require

payment of just costs and any actual expenses, including

attorney fees, incurred as a result of the removal."  Plaintiff

argues that the only reason Defendants removed the action on the

meritless fraudulent joinder argument is to delay the matter,

which was set for an order to show cause hearing before the

state court judge in two weeks.  On the day Defendants' brief in

opposition to Plaintiff's verified complaint and order to show

cause was due, Defendants removed the case instead.  Plaintiffs

argue that Defendants' removal was in bad faith because

Defendants were well-aware of Telford's direct connection with

DuPont's noncompliance of ISRA, and clearly understood the

standard for assessing whether her inclusion as a defendant was

proper.  Plaintiffs argue that Telford would have been named as

a defendant regardless of her state of citizenship.

Based on Defendants' tactic to delay the proceedings

through a baseless removal, Plaintiff contends that it is

entitled to the costs of having to file a remand motion, as well

as to oppose Defendants' motions to dismiss.  In response,

Defendants, not surprisingly, refute that their removal based on

the fraudulent joinder doctrine was in bad faith or an

intentional tactic to delay the proceedings, and it was instead

objectively reasonable.

The U.S. Supreme Court comprehensively analyzed the

16

availability of fees and costs under § 1447(c) when a case is

remanded.  The Supreme Court explained:

> By enacting the removal statute, Congress granted a right
> to a federal forum to a limited class of state-court
> defendants.  If fee shifting were automatic, defendants
> might choose to exercise this right only in cases where the
> right to remove was obvious.  But there is no reason to
> suppose Congress meant to confer a right to remove, while
> at the same time discouraging its exercise in all but
> obvious cases.  Congress, however, would not have enacted §
> 1447(c) if its only concern were avoiding deterrence of
> proper removals.  Instead, Congress thought fee shifting
> appropriate in some cases.  The process of removing a case
> to federal court and then having it remanded back to state
> court delays resolution of the case, imposes additional
> costs on both parties, and wastes judicial resources.
> Assessing costs and fees on remand reduces the
> attractiveness of removal as a method for delaying
> litigation and imposing costs on the plaintiff.  The
> appropriate test for awarding fees under § 1447(c) should
> recognize the desire to deter removals sought for the
> purpose of prolonging litigation and imposing costs on the
> opposing party, while not undermining Congress' basic
> decision to afford defendants a right to remove as a
> general matter, when the statutory criteria are satisfied.
>
> In light of these large objectives, the standard for
> awarding fees should turn on the reasonableness of the
> removal.  Absent unusual circumstances, courts may award
> attorney's fees under § 1447(c) only where the removing
> party lacked an objectively reasonable basis for seeking
> removal.  Conversely, when an objectively reasonable basis
> exists, fees should be denied.  In applying this rule,
> district courts retain discretion to consider whether
> unusual circumstances warrant a departure from the rule in
> a given case.

Martin v. Franklin Capital Corp., 546 U.S. 132, 140–41 (2005)

(internal quotations and citations omitted).

Defendants' removal of Plaintiff's complaint two weeks

before a hearing which had the potential of imposing over a

billion dollar judgment against DuPont and a several hundred

thousand dollar judgment against Telford under a rarely

successful theory of fraudulent joinder is indeed suspicious.[2]

Defendants also fail to provide any substantive argument for why

Plaintiff would intentionally include a non-diverse defendant,

other than to summarily conclude Plaintiff must have wished to

avoid its case being heard in federal court.[3]

---

[2] See Miloseska v. Liberty Travel, Inc., 2012 WL 6771978, at *4
(D.N.J. 2012) (citing Brown v. Jevic, 575 F.3d 322, 327 (3d Cir.
2009) ("The cases where courts in this circuit have found
fraudulent joinder are few and often it is only when one can say
with reasonable certainty that a claim against a party cannot
stand, such as when a party cannot be sued because of its status
or because the statute of limitations has expired.").

[3] This point raises the issue of whether the matter belongs in
this Court even if subject matter jurisdiction existed.  A
federal court has the "virtually unflagging obligation" to
exercise the jurisdiction given it, but abstention from the
exercise of federal jurisdiction is appropriate and necessary in
several contexts.  See Colorado River Water Conservation Dist.
v. U. S., 424 U.S. 800, 817 (1976).  One area where abstention
may be required was announced in Burford v. Sun Oil Co., 319
U.S. 315 (1943), where the Supreme Court "held that federal
courts should exercise equitable discretion and refrain from
exercising authority over questions involving basic problems of
state policy pertaining to the regulation of important state
natural resources, even if federal court jurisdiction is
predicated on diversity of citizenship." Grode v. Mutual Fire,
Marine and Inland Ins. Co., 8 F.3d 953, 956–57 (3d Cir. 1993)
(discussing Burford and other abstention doctrines).  The
Burford abstention is usually applied to state regulatory
matters such as establishing rates for natural gas or
transportation, discontinuing railroad passenger services,
discontinuing intrastate air service, or applying state eminent
domain procedures.  Id. (citing cases).

    A strong argument could be made that even if subject matter
jurisdiction could be established in this case, the Court would

The Court recognizes that it has been over six months since the order to show cause hearing would have occurred in New Jersey state court.  This Court's congested docket is the fault for that delay, however, and not Defendants.  But even if Defendants hoped to rely upon the Court's congested docket to delay Plaintiff's case against them, Defendants' removal of Plaintiff's case did not preclude Plaintiff from filing, contemporaneous with its motion to remand, an application for emergent relief under Federal Civil Procedure Rule 65(a) and Local Civil Rule 65.1, which are akin to the New Jersey Court Rule 4:67(a) invoked by Plaintiff's complaint in state court.[4] If Plaintiff took that course, it would have triggered immediate action by this Court to assess the fraudulent joinder argument in the context of addressing Plaintiff's request for an order to

_____

nevertheless be compelled to abstain under Burford and remand the matter because ISRA is a complex regulatory environmental statute unique to New Jersey which presents substantial public importance, and in which the federal court should not become enmeshed.  See New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989) (explaining that "Burford is concerned with protecting complex state administrative processes from undue federal interference").  The Court does not need to make such a determination, however, because the matter must be remanded for lack of diversity jurisdiction.

[4] Plaintiff's complaint was originally filed in Chancery Court, but was transferred to the Law Division.  Even though the N.J. court rule concerns summary actions, these three rules set forth the procedures for the entry of an order to show cause based on a verified complaint.

show cause.

Thus, Defendants' removal of Plaintiff's case did not, by itself, cause significant delay of a hearing on Plaintiff's verified complaint and request for an order to show cause, as emergent relief was available in this Court. Moreover, as Plaintiff points out, the clean-up of the area around the 28,000 residents affected by the Chambers Works site will – unfortunately – take 1,000 years to complete, so the delay to the cleanup process caused by Defendants' removal appears minimal.

In short, even though Defendants' fraudulent joinder argument is not persuasive, it cannot be found to be objectively unreasonable, particularly if Telford's statements in her declaration are found to be credible down the line. Defendants' removal of Plaintiff's case does not present the "unusual circumstances" that warrant a departure from the rule that a court may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Consequently, Plaintiff's request for an award of attorney's fees and costs will be denied.[5]

_____

[5] The filing of Telford's motion to dismiss was unnecessary, because in order for the Court to have considered that motion, subject matter jurisdiction must have first been established, which would have been accomplished by the dismissal of Telford from the case. See In re Briscoe, 448 F.3d 201, 216 (3d Cir. 2006) (explaining that once a district court determines that the

## CONCLUSION

Defendants' attempt to remove Plaintiff's case from state court to this Court on the basis that Plaintiff fraudulently joined the Director of DuPont's Remediation Group as a defendant was not objectively unreasonable, but it is unavailing. Plaintiff did not improperly join Telford to the action, and her New Jersey citizenship results in a lack of diversity between Plaintiff and Defendants.  Plaintiff's motion to remand will be granted, and the case returned to New Jersey state court. Defendants' motions to dismiss will be denied as moot.

An appropriate Order will be entered.


Date:    July 26, 2017                s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.

_____

joinder of a defendant was "fraudulent," the court can "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction").  Even though Plaintiff seeks attorney's fees and costs associated with filing of its motion to remand as well as filing its opposition to Telford's motion to dismiss, Plaintiff could have requested that its opposition to Telford's motion be stayed pending the outcome of its motion to remand.  See, e.g., Jones v. Virtua Health, Inc., 2017 WL 77411, at *1 (D.N.J. 2017) (noting that the Court had granted Plaintiff's request to stay further briefing on the motion for summary judgment pending the Court's decision on the motion to remand).  In the event that Telford renews her motion to dismiss upon remand, Plaintiff's opposition is already prepared, and the costs of its preparation most likely would have been incurred anyway even if the case had not been removed.